Woods' adm'r.
        vs
Nelson's ad'r.
    &c.

</div>

---

CHANCERY.   **Woods' Administrator** *vs* **Nelson's Administrator, &c.; and Woods &c.** *vs* **Woods' Administrator &c.**

*Case* 134.                ERROR TO THE ESTILL CIRCUIT.

*Administrators.   Executors.   Probate of Wills.*

*October* 2.   CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

In January, 1844, James Woods died, leaving his second wife surviving, and also children by both wives.

Case stated in the bill.

In February, 1844, the County Court of Estill county, in which he had lived and died, admitted to probate, as his last will and testament, a writing, by which Jonathan Nelson was appointed executor, with directions to sell, after the death of the widow, two slaves, and di-

vide the proceeds among the five children of the second wife, and also to sell, as soon as he should deem it practicable, the tract of land on which the testator lived, (being about 173 acres,) and divide the proceeds between his two sons, Fielding and Simpson Woods, children of the last marriage. At the same time, Jonathan Nelson was admitted and qualified as Executor in the same Court.

In October, 1844, John Woods and others, children and heirs of the decedent, James Woods, by his first marriage, filed their bill in chancery, under the statute, to vacate the will. In May, 1846, the will was vacated by a decree of the Court; and in July, 1846, John Woods was appointed administrator by the County Court of Estill. Prior to the decree vacating the will, Jonathan Nelson, as executor, had sold the land, in August, 1844, to Fielding and Simpson Woods, at the price of $1200, to be paid in future; and they, after occupying it for about two years, had sold it, in June, 1846, to Josiah P. Harris, for $1550, payable in future, but no part of the purchase money, on either sale, has yet been paid.

On the 27th of December, 1844, after the death of the widow, and after process in the suit for vacating the will had been served on most of the defendants, but before service on Jonathan Nelson, he, as executor, sold and delivered the two slaves to J. Noland for $625, a part of which was paid in hand, or in a short time, and the residue before the decree annulling the will, and the proceeds of the sale were distributed, as directed by the will, among the five children of the second wife. Nelson, as executor, had also disposed of the personal estate, and collected and paid debts. And, in August, 1846, John Woods, as administrator, and also as heir, in conjunction with the other children and heirs of James Woods by the first marriage, filed this bill against Nelson and the devisees in the alleged will, and Harris and Noland purchasers of the land and slaves, charging fraud against the pretended executor and devisees, in obtaining probate of the alleged will, in the sales of the land and slaves, and in all acts done by Nelson, as exe-

cutor, claiming that all of these acts are void, and praying for a partition of the land, and for a sale of the slaves, and distribution of the proceeds, and for an account of rents and hires, and a settlement and distribution of the entire estate, and for all equitable relief.

The answers generally maintain the validity of the acts done by Nelson. Harris, expressing a desire to retain the land under his purchase, submits the question to the Court. Fielding Woods sets up, by way of cross bill, a demand for work and labor against his deceased father, and also a demand in right of his wife, for money received by his father as her guardian, from her former guardian, and his wife unites in the prayer for a settlement and payment of this demand. Nelson having died before answer, his administrator answers, exhibiting statements of receipts and disbursements by Nelson, and claiming allowance for debts paid, and for expenses and commissions, &c. He also, by cross bill, claims indemnity from the five devisees, among whom the proceeds of the sale of the slaves were distributed according to the will. The complainants, in answer to the cross bill of F. Woods, resist the claims therein set up, and insist that these claims, and especially that in right of the wife, ought not to be litigated in this suit.

A commissioner was appointed, who reported the facts and evidence upon various matters involved in the case. And, on the hearing, a decree was rendered, sustaining the sale of the slaves to Noland, but vacating, or disregarding the sale of the land, decreeing rent against F. and S. Woods, during their occupancy, and against Harris, during his occupancy, and a surrender of the possession to a Commissioner appointed to make sale of the land, which, by consent, was decreed instead of a partition. The decree also expresses the opinion, that the claims set up by F. Woods and his wife, may be properly litigated in this suit, and that the payment of debts by Nelson, as executor, is to be treated as valid. And the case was re-submitted to the Commissioner, with directions to re-state the accounts of Nelson, as executor, charging him with the proceeds of the personalty and choses in action which came to his

hands, and the price of the two slaves sold, and credit- <span>Woods' Adm'r</span>
ing him with disbursements, in payment of James <span>Nelson's Ad'r,</span>
Woods' debts, "including necessary expenses and com- <span>&c.</span>
pensation rendered necessary and serviceable."

Two writs of error are prosecuted for the reversal of
this decree. The one by F. and S. Woods and Harris,
who complain that the decree disregards the sale of the
land by Nelson, and directs the payment of rent, and
the surrender of possession. The other by John Woods,
the administrator, who complains of error, first, in not
directing the slaves to be re-sold, and in not charging
Noland with hire, or, at any rate, in not charging Nel-
son's administrator with the difference in the price ob-
tained from Noland, and that which had been contract-
ed for in a previous sale made by Nelson, but rescinded,
at the request of the five devisees: Second, in allowing
credits for debts paid by Nelson, and for his services and
expenses; and, third, in allowing the claims set up by
F. Woods and wife to be litigated in this suit, and in not
dismissing their cross bill. Each of these writs having
been sued out upon the same record, the two cases have
been heard together; and, in fact, they involve the
same general question, under such variation only as is.
occasioned by its application to the different subjects of
land, slaves and personalty.

The general question involved in the case is, as to the
validity of the acts done by Nelson's executor, under
the probate and letters testamentary granted by the
County Court of Estill, and before the will was vacated
by the decree of the Circuit Court. The one party con-
tends that, as it now conclusively appears that there
never was a will, all acts of the pretended executor,
done under color of the authority of the supposed will,
are void; while the other party contends that, the al-
leged will having been established and admitted to pro-
bate, by the judgment of a competent tribunal, the acts
done under the authority of the will, by the executor
therein appointed, and before the rendition of the de-
cree, which determined that there was no will, are
clothed with the authority of the first judgment or sen-

Woods' adm'r.
vs
Nelson's ad'r,
&c.

An executor derives his power to act from the probate of the will. Acts done before probate are valid or invalid as the will may be proved or not. If the will be proved, his acts are to be regarded as valid, though the probate be subsequently vacated and set aside by bill in chancery.

tence, and must, therefore, be deemed valid, notwithstanding the subsequent sentence of nullity against the will.

It seems to be a proposition universally asserted, that an executor derives his authority from the will, and not from the probate or letters testamentary, but that the probate is the essential and exclusive evidence of the will, and, therefore, indispensable for sustaining his acts or proving his authority in any Court. The effect of this qualified proposition is, that acts in *pais* of the executor, though done before probate, are valid, if the will is afterwards admitted to probate by the proper tribunal, but if there be no probate, they may be avoided or disregarded by the administrator. And as title under the will can only be proved by the probate, if there be no probate, there is no title under the will, and the person intermeddling with the estate as being named executor in a will, must be regarded as an executor *de son tort*. It is, then, the probate, and that alone, which gives authority or legal efficacy to the will itself, from which the executor derives his power. And whatever room there may be for discriminating between the will and the probate as the source of the executor's power, still, as the probate is itself a judgment of a tribunal having not only plenary, but, in the first instance, exclusive jurisdiction of the question of will or no will, and having the like jurisdiction over the granting of administration of intestates' estates, as it is the policy of the law, and the interest of all concerned, that there shall be speedily and continually a personal representative of every decedent, and as the question of will or no will, though decided in this case, within two or three years after the probate is subject, in ordinary cases to be made, by bill filed at any time within seven years after the probate, and in case of disability by infancy, &c. may be made after the lapse of a much longer period, with the effect of determining, in opposition to the judgment of the original Court of probate, that the paper admitted to probate is not the will of the party; we should not feel authorized, on the ground of the discrimination referred to, and against the weighty practical considera-

tions belonging to the subject, to determine that all titles derived from the person having, in favor of his executorial office and power, the solemn judgment of a competent tribunal unreversed, and not even suspended by appeal, are subject to be defeated by the contrary judgment of another tribunal, in a different proceeding, and after the lapse of years.

The general principle with regard to the validity of acts done under a valid judgment, while it remains in force and unsuspended is, that they are not invalidated by a subsequent reversal. And this principle has been considered as being essential to the safety of the community, and as due to the confidence which they have a right to repose in the efficacy and authority of judicial proceedings. We need not refer to the cases in which execution sales, made under a judgment which is afterwards reversed, have been held to remain valid and effectual. In the case of *Moore* vs *Tanner's Administrator*, (5 *Monroe*,) this Court, in effect, say that, although " the will may have been erroneously admitted to record," a payment to the executor, before a revocation of the probate, is valid. And it has been determined, " that payment to an executor who had obtained probate of a forged will, was a discharge of the debt, though the probate was afterwards revoked, and administration granted to the next of kin:" *Toller's Law of Executors*, 77. So, "if administration be regularly granted, and afterwards, for cause, repealed, all lawful acts of the first administrator remain good, or if administration be granted to a wrong person, and afterwards repealed on citation, all acts of the first administrator are good, as if he gives the goods of the intestate to another:" 1 *Com. Digest, title Administrator, b.* 8. There is some apparent confusion in the English cases with regard to the effect of a revocation of the grant of administration or of probate, growing mainly out of the different modes of proceeding in which the revocation is made. In a proceeding by appeal, the first grant or sentence is suspended, and all intermediate acts done under it are dependent upon the result of the appeal. But the proceeding by citation, which is an independent

WOOD'S ADM'R.
*vs*
NELSON'S AD'R.
&c.

The probate of a will before a competent tribunal, is a judgment, and sales made under such judgments are valid, though the probate be subsequently set aside, and a payment to an executor in such case, is valid and effectual: *Moore* vs *Tanner's ad'r.* (5 *Monroe, Tollers on Executors*, 77.) So the acts of an adm'r. are valid though he be afterwards displaced.

Woods' adm'r.
    vs
Nelson's ad'r.
    &c.
suit, does not suspend the original sentence, and though it result in a revocation, the intermediate acts are not thereby necessarily made void.

In the case of *Benson's Administrator* vs *Rice, &c.* (2 *Nott & McCord*, 577) when the ordinary, having at first rejected a will offered for probate, and granted administration with an order of sale, changed his opinion five years afterwards, and admitted the will to probate, the question was, whether an intermediate purchase from the administrator could hold against the will. The Supreme Court of South Carolina, reversing the judgment of the inferior Court, decided that he could, saying that "the community who are not under the authority of judicial power, should be certain of protection in their rights."

We are of opinion that the charge of fraud in procuring the execution of the alleged will, and in obtaining probate thereof, is not sustained by the proof as to either particular. And as the Court which granted the probate, had unquestionable jurisdiction of the question and of the case; and as its sentence or judgment was not suspended by the suit in chancery contesting the validity of the will, but remained in force until, by the termination of that suit, the writing which had been admitted to probate, was definitively pronounced not to be the will of the decedent, we cannot admit that this judgment, so conclusive at the time, gave no temporary authority to the executor, and furnished no permanent protection either to him, or to the community who may have dealt with him in consequence of his official character.

There may be ground for discriminating between the validity of those acts which an executor could not perform merely as the personal representative, without a power conferred by the will, further than by his mere nomination as executor, and those acts which the personal representative might do, whether appointed executor by the will, or appointed administrator by the Court, which had power to confer title and authority, over the personalty, by its appointment. With regard to acts of the latter description, we think there can be

An executor who has power, by will, to sell lands, who contracts for a sale but has not conveyed until the will is set aside, has then no power to convey and the sale should be set aside.

no doubt. And with regard to others, that is, to the sale of the land, it is not necessary to decide, because there was, in fact, no complete sale, no transfer, nor attempt to transfer the title, if the power existed, and no consideration paid, either by F. and S. Woods, to whom the executor executed a title bond, or by Harris, who received a similar bond from them. The transaction with F. and S. Woods was evidently founded upon their supposed interest in the land, or its proceeds, and was, in substance, nothing more than an election to take the land instead of the proceeds. It was rather an agreement by which a sale should be dispensed with, than an actual sale. But if it should not be so understood, still, as neither they nor Harris, who seems himself to have regarded his rights as dependent upon, or connected with the fate of the will, paid any part of the purchase which alone could give them a substantial equity, there is, in truth, no ground on which they could justly claim to divest the heirs of the title which descended to them. There was no error, therefore, in vacating or disregarding the sales set up by them, and there was obviously no injustice in charging them with rents for the respective periods of their occupancy. Nor can they complain of the amounts charged.

Wherefore, the decree upon their writ of error is *affirmed.*

The residue of the decree, so far as it is final, is in principle conformable with the views expressed in this opinion, which go to sustain the acts of the executor, with regard to the personalty, and to protect the interests acquired in good faith under them. We are not satisfied that the sale of the two slaves to Noland was fraudulent, as alleged, but think the contrary is fairly to be assumed under the circumstances. As there had been a previous sale by him, to another individual, at a higher price, which he might have enforced, we think he should be charged with the price agreed on in the first sale. The fact that he rescinded the first sale, at the cost of $25, and made the second at a lower

*Marginal note (top):* Woods' Adm'r.. vs Nelson's Ad'r. &c.

*Marginal note (side):* A decree should be final to authorize this Court to reverse; interlocutory orders are not the subject of appeal or writ of error.

price than the first, and to his own relation, might fur-
nish ground for an unfavorable inference, were it not
that all this was done by the request, and at the ex-
pense of the five devisees, who were supposed to be en-
titled to the proceeds of the sale, and who agreed to in-
demnify the executor. Their loss by the transaction,
was the same in any event of the suit contesting the
will, and they evidently incurred it from motives of
humanity to the slaves. There is no evidence of fraud
on the part of Noland, and his title to the slaves was
properly regarded as valid, and, of course, he could not
be subjected to hire, with respect to the right of the ex-
ecutor Nelson, to be credited for the payment of debts
of the decedent, and for expenses incurred in the regu-
lar course of administering and managing the business
of the estate, in matters properly pertaining to a perso-
nal representative, and to be allowed the usual commis-
sions for his services, it is sufficient here to say, that
the decree conforms to the principles of this opinion, in
directing such credits and allowances. And as to the
question whether the claims set up by F. Woods & wife
in their cross bill, can be properly litigated in this suit;
the mere opinion of the Court that they may be so liti-
gated and settled, when, in fact there has been no de-
cision or settlement with respect to their validity or
amount, is not such a final decree, or order, or judg-
ment as can be brought before this Court for revision.
These claims have never been decided, nor acted on by
the Circuit Court. We remark, however, that in a
general settlement of the estate of James Woods, which
seems to be prayed for by the administrator and the
other complainants, their claims might properly be
brought into the account. And further, that they might
constitute a proper set-off to any demand on the part
of the Executor Nelson, or his administrators, against
F. Woods, and might to the same extent, turn out to be
proper credits to said administrator, in the account be-
tween him or his intestate, and the administrator of
James Woods; and that so far as the latter adminis-
trator separately, or with his co-heirs, sets up any de-
mand against F. Woods in this case, as they do with

respect to rents, these claims may properly be set off in this suit; and, we cannot say, that on one or more of these grounds, they should not be finally ascertained, and decreed in the present case.

With respect to so much of the decree as relates to the charge to be made against the administrator of Nelson, on account of the sale of the two slaves, although we understand the decree as directing the charge to the extent only of the price obtained from Noland, and to be therefore erroneous, as already stated, still, as this is a mere direction to the commissioner, upon re-submitting the cause to him, and there is no report stating the account as directed, and no decree fixing or ascertaining the amount of this charge, the direction given to the commissioner though erroneous, being yet interlocutory only, is not a ground for reversing the decree.

There being no error available for the reversal of the decree upon the writ of error of John Woods administrator of James Woods, vs Nelsons administrator, &c. the decree upon that writ also is affirmed.

*Caperton* for plaintiffs; *Turner* for defendants.